## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RODNEY HILL** | ) | |
| Baltimore, Maryland | ) | |
| *Plaintiff,* | ) | |
| **v.** | ) | |
| | ) | |
| **THE JOHNS HOPKINS UNIVERSITY** | ) | Case No.: 1:25-cv-4067 |
| 3400 N. Charles Street | ) | |
| Baltimore, Maryland 21218 | ) | |
| **SERVE ON**: TIFFANY WRIGHT, SVP & | ) | |
| GENERAL COUNSEL | ) | |
| 3400 N. CHARLES STREET | ) | |
| 113 GARLAND HALL | ) | |
| BALTIMORE MD 21218 | ) | |
| | ) | |
| *Defendant.* | | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW**, Rodney Hill ("Plaintiff"), and brings this Complaint and Demand for Jury Trial against Defendant The Johns Hopkins University ("JHU" or "University"), and states as follows:

## INTRODUCTION

Plaintiff Rodney Hill brings this civil action to redress egregious violations of his constitutional and statutory rights stemming from discriminatory termination, unlawful retaliation, and breaches of contractual and employment obligations by The Johns Hopkins University. The Defendants, acting under color of institutional authority and pursuant to official policies and practices of the University, engaged in a pattern of unlawful conduct based on Plaintiff's protected characteristics—specifically his age (over 40 years old) and his protected activity of filing a discrimination complaint—that resulted in profound personal, professional, and economic harm.

Plaintiff was unlawfully terminated from his position as Public Safety Senior Advisor effective December 8, 2023, in direct retaliation for filing a written discrimination complaint against his supervisor, Dr. Branville Bard, on June 29, 2023, and due to age-based discrimination evidenced

1

by age-related comments and disparate treatment. The stated reason for termination—a reduction in force and reorganization—is pretextual, contradicted by contemporaneous evidence that JHU was actively hiring for comparable positions, creating new leadership roles, and expanding its Public Safety department at the time of Plaintiff's termination.

## VENUE AND JURISDICTION

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and related federal and state laws.

2. Venue is proper in this District under 28 U.S.C. § 1391(b) because all events, omissions, and injuries giving rise to these claims occurred within the City of Baltimore, Maryland, and within the Northern District of Maryland. All Defendants were employed, conducted business, or maintained their principal places of operation in the Northern District of Maryland at all times relevant to this action. The Johns Hopkins University is located at 3400 N. Charles Street, Baltimore, Maryland 21218, within this District, and all policy decisions concerning Plaintiff's employment, investigation of his discrimination complaint, and termination were made and effectuated within this District.

3. Plaintiff has satisfied all applicable administrative prerequisites, including filing a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about June 29, 2023 (EEOC Case No. 531-2024-01432), and receiving a Notice of Right to Sue dated September 19, 2025. Plaintiff files this action within 90 days of receiving the EEOC's Notice of Right to Sue, in compliance with 29 U.S.C. § 626(d) and 42 U.S.C. § 2000e-5(f).

## PARTIES

4. Rodney Hill is a natural person domiciled in the State of Maryland, who at all relevant times was an employee of The Johns Hopkins University, employed as a Public Safety Senior Advisor. Plaintiff is over 40 years of age, placing him within the protected class under the Age

Discrimination in Employment Act. Plaintiff brings this action on his own behalf to seek relief for the violations of his constitutional, statutory, and contractual rights as described herein.

5. The Johns Hopkins University is a non-profit educational institution with its principal place of business at 3400 N. Charles Street, Baltimore, Maryland 21218. JHU is duly organized and existing under the laws of the State of Maryland, and operates as an employer of over 1,000 employees in the Northern District of Maryland. At all relevant times, JHU was the direct employer of Plaintiff Rodney Hill and is responsible for the employment decisions, policies, practices, and customs affecting Plaintiff. JHU is sued in its organizational capacity for its policies, practices, and customs causing or contributing to the violations of Plaintiff's rights, and for breach of contract and statutory obligations regarding employment, wages, and non-discrimination.

## FACTS COMMON TO ALL COUNTS

### Employment History and Qualifications

6. Plaintiff Rodney Hill is a highly qualified professional with an outstanding record of public service, legal expertise, and law enforcement experience. Plaintiff has been a licensed attorney in the State of Maryland since 1996 and has held numerous distinguished positions, including:

- **Assistant State's Attorney**, Baltimore County State's Attorney's Office (2006-2010), where Plaintiff received an award from U.S. Attorney Rod Rosenstein for his work with the Maryland Human Trafficking Task Force;

- **Associate General Counsel**, Morgan State University (2010-2012);

- **Chief Solicitor**, Baltimore City Law Department (2012-2013);

- **Chief of the Office of Professional Responsibility**, Baltimore City Police Department (2013-2018), where Plaintiff received an award from the Federal Bureau of Investigation for his performance in a police corruption case and a Mayor's Citation for his leadership during civil unrest in 2015;

- **Chief Legal Advisor**, Baltimore County Police Department (2019-2022), where he received a commendation from the Chief of Police;

- **Police Lieutenant**, Montgomery County Police Department (1985-2005), where Plaintiff received numerous commendations and an award from the Chief of Police for his service as part of the D.C. Joint Sniper Task Force.

7. Prior to his full-time hiring at Johns Hopkins in August 2022, Plaintiff served as a Security Policy Advisor for Johns Hopkins Public Safety (2018-2019), during which time he received no negative feedback or performance concerns from any supervisor.

**Hiring and Initial Employment**

8. In August 2021, Dr. Branville Bard was hired as Vice President for Public Safety at The Johns Hopkins University with a mandate to build a police department from scratch. Rianna Matthews-Brown, former Deputy Chief of Staff to the Office of the President, recommended Plaintiff to Dr. Bard as a suitable candidate for a Public Safety position, based on Plaintiff's extensive legal background, law enforcement experience, and prior employment at Johns Hopkins.

9. Dr. Bard met with Plaintiff and expressed interest in hiring him. Dr. Bard explicitly stated that he hoped Plaintiff would be helpful in creating JHU's new private police department due to Plaintiff's legal expertise and familiarity with Maryland law, including the Police Training Act (Md. Code, Pub. Safety § 3-201).

10. Plaintiff initially began employment with JHU as a contractor in August 2021, and was converted to a full-time employee with the title of "Public Safety Senior Advisor" in August 2022, at which time he was compensated as a senior member of the Public Safety leadership team.

11. In all employment documents and official communications, Plaintiff was recognized as a senior advisor and second in command of the Public Safety department, responsible for strategic planning, supervision of multiple departments and security operations, and providing legal and policy guidance to Dr. Bard and the Public Safety leadership team.

**Performance and Responsibilities**

12. Throughout his tenure, Plaintiff performed his job responsibilities competently, professionally, and in accordance with all University policies and expectations. Dr. Bard consistently demonstrated satisfaction with Plaintiff's work performance through his conduct and communications, as evidenced by:

a) **Assignment of Additional Responsibilities**: In the Spring of 2023, when Directors of Security at Johns Hopkins Suburban Hospital and Johns Hopkins Howard County Medical Center were terminated, Dr. Bard explicitly assigned Plaintiff to oversee the security teams at both hospitals in addition to his existing duties. This assignment demonstrates that Dr. Bard trusted Plaintiff's capabilities and was satisfied with his performance, as such sensitive oversight roles would not be assigned to an underperforming employee, particularly one he allegedly intended to terminate;

b) **Continuation in Second-in-Command Role**: Dr. Bard identified and maintained Plaintiff as second in command of Public Safety, directing other employees to contact Plaintiff during Dr. Bard's absences (as evidenced by Dr. Bard's "out of office" messages). This role was maintained throughout the Spring and Summer of 2023, even during the period when Dr. Bard allegedly harbored serious performance concerns;

c) **Regular Leadership Participation**: Plaintiff regularly attended weekly staff meetings with Dr. Bard, led weekly staff meetings in Dr. Bard's absence, met with Dr. Bard one-on-one almost weekly, and communicated with him almost daily until Dr. Bard began routinely canceling these one-on-one meetings in or about May 2023—a change in behavior that occurred only after Plaintiff filed his discrimination complaint;

d) **Quality of Work Product**: Plaintiff researched and drafted numerous key documents used by Public Safety, including the Memorandum of Understanding between JHU and the Baltimore City Police Department (December 2022), which was posted on the JHU website. Plaintiff drafted a comprehensive memo regarding weapons detection systems at the hospitals that was so well-received by Dr. Bard that he presented it to senior health system leadership. Dr. Bard directed Plaintiff to remove his name from the memo and presented it under the name of a committee, demonstrating Dr. Bard's reliance on Plaintiff's work product quality and the value Dr. Bard placed on it;

e) **Policy Development Leadership**: Plaintiff oversaw the drafting of numerous policies for Public Safety for both the Health System and the JHU Police Department, and at no time did Dr. Bard express dissatisfaction with this work or request revisions beyond industry-standard editing practices;

f) **Hiring Committee Participation**: Throughout his tenure, Plaintiff was directed to participate on numerous hiring committees and even served as the Hiring Manager for the position of Associate Vice President for Public Safety, a responsibility that would not be given to an underperforming employee;

g) **Salary Increase and Positive Performance Communication**: In February 2023, Dr. Bard met with Plaintiff to communicate a 1% salary increase. During this meeting, Dr. Bard explicitly stated that the reason for the 1% increase was to "even out the salaries" among the Associate Vice Presidents for Public Safety and Plaintiff. Dr. Bard expressed satisfaction with Plaintiff's performance, the communication was "light and pleasant," and Plaintiff thanked Dr. Bard for the raise and offered to take him to a meal to express his gratitude. If Dr. Bard harbored serious performance concerns, as he later claimed, this meeting would have been the appropriate time to discuss them—yet no such discussion occurred.

13. Contrary to Dr. Bard's later allegations in the University's EEOC response, there is no contemporaneous documentation—no email, written warning, performance improvement plan, counseling memo, or any other record—showing that Dr. Bard ever expressed dissatisfaction with Plaintiff's job performance. The absence of any such documentation is

telling, particularly given that Dr. Bard, a highly experienced leader overseeing approximately 1,500 personnel, is well aware of the importance of documenting and communicating performance concerns to subordinate employees.

14. In fact, in early 2023, when Dr. Bard wished to terminate another employee (an administrative assistant named Kathleen Stewart), the Executive Vice President for Finance & Administration informed Dr. Bard that he could not proceed with the termination without first documenting the performance concerns and placing the employee on a Performance Improvement Plan. Dr. Bard complied with this directive in that instance, placing the assistant on a PIP.

15. By contrast, Plaintiff never received a written performance warning, coaching memo, Performance Improvement Plan, or any documented communication expressing performance concerns.

16. Dr. Bard's alleged post complaint concerns about Plaintiff's performance—are either entirely fabricated or grossly exaggerated. These allegations were made only retrospectively in Dr. Bard's response to the EEOC after Plaintiff had been terminated and after the EEOC investigation had been initiated. Notably, Dr. Bard provided no contemporaneous documentation supporting any of these allegations.

**Age-Related Comments and Discriminatory Conduct by Dr. Bard**

17. During various periods throughout Plaintiff's employment at JHU, beginning after he became a full-time employee in August 2022, Dr. Bard made numerous comments about Plaintiff's age and engaged in conduct that was unprofessional, demeaning, and created a hostile work environment based on age.

18. These comments were made both to Plaintiff directly and in front of other employees, creating a pattern of age-based harassment and discrimination.

19. On a particular occasion in January or February 2023, while Plaintiff, Dr. Bard, Walter Simmons (Associate Vice President for Public Safety of the Health System), and LaTicia Douglas (Special Assistant to Dr. Bard) were having lunch together at a seafood restaurant in Fells Point, Baltimore, Dr. Bard made a derogatory age-related comment directed at Plaintiff.

20. Specifically, when a waiter approached the table, Dr. Bard told the waiter that Plaintiff was their "grandfather" and that the group was celebrating Plaintiff's birthday. The waiter, believing Dr. Bard's statement to be genuine, brought a piece of cake with a candle to the table.

21. The statement was deliberately demeaning and was made in the presence of multiple colleagues, with the apparent intent to belittle Plaintiff based on his age and to position him as an outsider ("grandfather" figure) relative to younger members of the team.

22. Dr. Bard made additional sporadic comments about Plaintiff being "older than everyone else" and made other subtle age-related remarks throughout Plaintiff's employment. These comments were made both directly to Plaintiff and in the presence of other employees. Initially, Plaintiff tolerated these comments as being relatively infrequent, but they contributed to a pattern of age-based animus that became apparent over time, particularly in light of the discriminatory decision to terminate Plaintiff's employment.

23. The "grandfather" comment and other age-related statements were made by Dr. Bard, the decision-maker responsible for Plaintiff's termination, in his role as Plaintiff's direct supervisor and are evidence of discriminatory animus.

**The Discrimination Complaint**

24. On June 29, 2023, Plaintiff forwarded a written complaint to Paul Pineau, Senior Vice President and General Counsel, describing a pattern of conduct by Dr. Branville Bard that Plaintiff characterized as intimidation, bullying, and highly inappropriate racial and gender-charged comments that created a hostile and unprofessional work environment in violation of Title VII of the Civil Rights Act of 1964 and University policy.

25. In his written complaint, Plaintiff detailed specific instances of discriminatory and harassing conduct by Dr. Bard, including:

a) Repeated intimidation and bullying conduct directed at Plaintiff;
b) Repeated comments about Plaintiff's salary, made in disparaging or insinuating tones;
c) Belittling jokes during staff meetings directed at Plaintiff;
d) Public jokes about Plaintiff's suits not being "tailor-made," made in front of other employees;
e) Comments made by Dr. Bard regarding African-American employees that were racially charged, including statements that an African-American employee (referred to as "WS") was

likely married to a White woman;

f) Comments by Dr. Bard that another African-American employee (referred to as "JJ") had a White baby, made in a manner that was derogatory and demeaning;

g) A pattern of communication breakdown, with Dr. Bard ceasing normal communication with Plaintiff beginning in July 2023;

h) Directive to Plaintiff to remove his name from a memo and present it under a committee name instead, taking credit for Plaintiff's work;

i) Inappropriate and invasive questions asked of female employees, such as asking employee "LD" whether she would consider babysitting Dr. Bard's daughter;

j) Disparaging remarks made by Dr. Bard about members of senior leadership;

k) Body-shaming comments made by Dr. Bard about employees' appearance and weight, including a comment that an employee was "so big, he would need two seats on a plane";

l) Exclusion of Plaintiff from key decisions affecting the Public Safety department.

26. The complaint was directed to Mr. Paul Pineau and addressed to the Office of the General Counsel, as Plaintiff understood Mr. Pineau to be the appropriate recipient for complaints regarding violations of federal employment law and University policy.

27. Upon receipt of Plaintiff's complaint, the General Counsel's Office directed the complaint to the Office of Institutional Equity ("OIE") for investigation and response, as is the University's standard practice.

**The Investigation by the Office of Institutional Equity**

28. Vice Provost for Institutional Equity Shanon Shumpert was assigned to investigate Plaintiff's complaint. Ms. Shumpert met with Plaintiff via Zoom for approximately one hour on or about July 6, 2023.

29. At the very beginning of the meeting, Ms. Shumpert informed Plaintiff that she and Dr. Bard are "very close friends." This statement by Ms. Shumpert was highly problematic and inappropriate, as it:

a) Revealed a direct personal relationship between the investigator and the subject of the complaint;

b) Created an immediate appearance of bias and lack of impartiality;

c) Signaled to Plaintiff that the complaint was unlikely to receive objective, impartial investigation;

d) Served as an implicit warning to Plaintiff that the complaint would not be treated seriously.

30. Despite Plaintiff's serious allegations of age discrimination, racial discrimination, gender discrimination, harassment, and creation of a hostile work environment, Ms. Shumpert's investigation was perfunctory and grossly inadequate. Specifically, Ms. Shumpert:

a) Failed to interview any of the witnesses to the racial harassment (the discriminatory comments about African-American employees' personal relationships and family members), despite Plaintiff's providing the names of witnesses;

b) Failed to interview the witness to the age-discrimination comment (the "grandfather" remark made in January-February 2023), who was present at the lunch in Fells Point;

c) Failed to conduct any independent investigation or follow-up on the factual allegations;

d) Failed to collect or review contemporaneous documentation (emails, communications between Dr. Bard and Plaintiff, personnel records, etc.) to verify or refute the allegations;

e) Made conclusory statements without conducting a substantive investigation.

31. After her cursory review, Ms. Shumpert informed Plaintiff that while she found Plaintiff to be "very credible," she concluded that the allegations, "even if true," did not violate Johns Hopkins University policy.

32. This conclusion is nonsensical and legally deficient:

a) Comments regarding employees' race, color, national origin, and age, if made as alleged, are inherently violations of federal law (Title VII and ADEA) and would logically constitute violations of any reasonable institutional policy;

b) Ms. Shumpert's conclusion that the allegations—if true—would not violate University policy was legally and factually absurd;

c) Ms. Shumpert's finding of Plaintiff's credibility combined with her finding that the conduct did not violate policy demonstrates the bias and inadequacy of the investigation.

33. Ms. Shumpert proposed that she would advise Dr. Bard of an "anonymous" complaint and would direct him to attend a workplace professionalism meeting.

34. Plaintiff objected to the anonymous approach and expressed his preference that Dr. Bard be directly informed that Plaintiff was the complainant, so that the two could work toward resolution of their working relationship. However, Ms. Shumpert insisted that Plaintiff remain anonymous.

35. On August 1, 2023, LaTicia Douglas, Special Assistant to Dr. Bard, entered Plaintiff's office and informed him that Dr. Bard had called her asking "Who made the complaint?" When Ms. Douglas responded, "I think you know who it was," Dr. Bard replied, "Rodney?" Ms. Douglas confirmed that it was Plaintiff who made the complaint. Dr. Bard then hung up. This exchange demonstrates that:

a) Despite Ms. Shumpert's stated commitment to keeping the complaint anonymous, Dr. Bard quickly learned the identity of the complainant;

b) Dr. Bard's reaction was immediate and defensive;

c) The disclosure of Plaintiff's identity as the complainant occurred in the afternoon of August 1, 2023, just three days after Ms. Shumpert's stated intention to keep the complaint anonymous and before any meeting or discussion with Dr. Bard had occurred.

36. Shortly after learning that Plaintiff had filed the discrimination complaint, the entire Public Safety leadership team was called to a mandatory meeting on the morning of August 4, 2023. At this meeting, Ms. Shumpert and Dr. Bard announced that there had been an "anonymous" complaint made regarding workplace conduct and proceeded to lecture the assembled leadership team about the importance of maintaining professional workplace communications and avoiding inappropriate comments. This meeting served to:

a) Publicly identify Plaintiff as the source of the complaint (despite the pretense of anonymity);
b) Create an implicit threat that employees who file complaints would face public scrutiny and potential retaliation;
c) Signal that Dr. Bard was aware of and potentially retaliating for the complaint;
d) Demonstrate that the "investigation" had concluded without any substantive inquiry.

37. On August 4, 2023, at 1:32 p.m., Plaintiff sent an email to Ms. Shumpert, copying Dr. Bard, in which Plaintiff reiterated his displeasure with being kept anonymous and restated that Ms.

Shumpert had found him to be very credible. In this email, Plaintiff stated: "I think it better if Dr. Bard is aware of his interactions with me individually, so they can be addressed."

38. Ms. Shumpert responded to Plaintiff's email on August 8, 2023, in which she explicitly acknowledged that "Branville Bard is aware of who the complainant is." After this acknowledgment, Ms. Shumpert closed the investigation without further action.

39. Immediately following Plaintiff's filing of the discrimination complaint in June 2023 and particularly after Dr. Bard learned of the complaint in early August 2023, Plaintiff's working relationship with Dr. Bard deteriorated markedly. Specifically:

   a) Dr. Bard began routinely canceling the previously regular one-on-one meetings with Plaintiff;
   b) Dr. Bard ceased regular daily communication with Plaintiff;
   c) Dr. Bard began excluding Plaintiff from key decision-making processes;
   d) The working relationship, which had been professional and collegial, became noticeably strained and distant;
   e) Plaintiff was effectively isolated and marginalized within the Public Safety leadership team.

**The Decision to Terminate Plaintiff's Employment**

40. Dr. Bard alleges that by early 2023, he had concluded that he would separate Plaintiff from employment. However, the stated reason for this decision—that Plaintiff's position had become "redundant" due to "changing business needs" and "reorganization"—is pretextual and contradicted by contemporaneous evidence.

41. In early 2023, Dr. Bard informed the Plaintiff that he would be hiring a Chief of Staff. Previously, there had been a staffing study done by a consultant organization name Huron. Huron had conducted a staffing study in early 2022 and published a report where they recommended a reorganization of the Public Safety Department to include a Senior Advisor and a Chief of Staff, as well as numerous other leadership positions; all of which were created and hired. In response to Dr. Bard informing the Plaintiff of the new position, the Plaintiff inquired about the different responsibilities between his position and the Chief of Staff. Dr. Bard informed the Plaintiff that his position would be more operational, while the

Chief of Staff would be in charge of the day-to-day administration. On several occasions Dr. Bard repeatedly told the Plaintiff that his position was safe and secured, especially since it was supported by the Huron report.

42. The University's claim that Plaintiff's position became redundant is belied by the following facts:

a) **Expansion of Department, Not Reduction**: At the time of Plaintiff's termination in December 2023, the Public Safety department was actively hiring new personnel, not conducting a reduction in force. The department was in the process of hiring two Deputy Chiefs of Police and over 100 police officers for the newly established JHU Police Department;

b) **Creation of New Positions**: Rather than eliminating positions, Public Safety created new leadership positions, including:
- The position of Deputy Chief of Staff (a position that did not previously exist);
- Additional regional and specialized security director positions;
- Expanded administrative and communications roles;

c) **Vacant Leadership Positions**: At the time of Plaintiff's termination, the following leadership positions within Public Safety remained vacant and for which Plaintiff was fully qualified:
- Associate Vice President (equal level to Senior Advisor) for Public Safety of the Johns Hopkins Health System;
- Executive Director of Security for Public Safety of the Johns Hopkins Health System's Baltimore area hospitals;
- Executive Director of Security for Public Safety of the Johns Hopkins Health System's greater Washington, D.C. area hospitals;
- Director of Security for Public Safety at Johns Hopkins Medicine Suburban Hospital (where Plaintiff was already providing supervisory oversight);
- Director of Security for Public Safety at Johns Hopkins Howard County Medical Center (where Plaintiff was already providing supervisory oversight);
- Director of Security for Public Safety at Johns Hopkins Hospital in Baltimore;
- Director of Training for Public Safety (an arear already under the supervision of the Plaintiff);
- Two Deputy Chief of Police positions for the Johns Hopkins Police Department;
- Multiple Captain positions for the Johns Hopkins Police Department;

d) **Alternative Positions Available**: Rather than eliminating Plaintiff's position, Dr. Bard could have—and should have—reassigned Plaintiff to one of the numerous vacant leadership positions for which he was qualified. Plaintiff's background, legal expertise, law enforcement experience, and prior positions at Johns Hopkins made him highly suitable for multiple available roles.

43. The Huron Consulting Group, in its May 2022 report to JHU, had specifically recommended the creation of the Senior Advisor position (among others) as part of a reorganization of Public Safety's organizational structure. The report explicitly identified the Senior Advisor role as necessary and valuable. When Dr. Bard hired Plaintiff in August 2022 and promoted him to full-time status, Dr. Bard explicitly affirmed the necessity and value of the Senior Advisor position. On multiple occasions, Dr. Bard told Plaintiff that "your position is safe and secure, especially since it was supported by the Huron report."

44. The timeline of Plaintiff's termination is highly suspicious and demonstrates pretextual motivation:

a) **February 2023**: Dr. Bard meets with Plaintiff and provides him a 1% salary increase, expressing satisfaction with his performance and explicitly assuring him that his position is secure;

b) **Spring 2023**: Dr. Bard assigns Plaintiff additional supervisory duties over security teams at two hospitals, demonstrating continued confidence in Plaintiff's abilities;

c) **June 29, 2023**: Plaintiff files discrimination complaint against Dr. Bard;

d) **Early August 2023**: Dr. Bard learns of Plaintiff's complaint. Within days, the Public Safety leadership team is called to a mandatory meeting where Dr. Bard and Ms. Shumpert announce (under the guise of anonymity) that a complaint has been made;

e) **August 4, 2023**: Plaintiff sends email to Ms. Shumpert identifying himself as the complainant and requesting that Dr. Bard be informed;

f) **August-October 2023**: Dr. Bard begins distancing himself from Plaintiff, canceling meetings and excluding him from decisions;

g) **November 8, 2023**: Plaintiff is informed that his position is being eliminated effective December 8, 2023, due to a reduction in force and reorganization.

45. The temporal proximity between Plaintiff's protected activity (filing the discrimination complaint in June 2023 and Dr. Bard's learning of the complaint in early August 2023) and the termination decision (communicated in November 2023) demonstrates causation. The change in Dr. Bard's behavior toward Plaintiff—from collegial and professional in February 2023 to

distant and excluding in August-October 2023—is directly traceable to Dr. Bard's awareness of the discrimination complaint.

46. Furthermore, Dr. Bard's post-hoc fabrication of performance concerns contradicts his own contemporaneous conduct. If Dr. Bard was dissatisfied with Plaintiff's performance in February 2023 (when he gave the 1% raise), why did he assign Plaintiff additional supervisory duties in Spring 2023? If Dr. Bard was dissatisfied in Spring 2023, why did he maintain Plaintiff as second in command, continue to include him in hiring decisions, and maintain daily communication until August 2023? If Dr. Bard was dissatisfied with Plaintiff's performance, why didn't he counsel and document the poor performance of Plaintiff? The answer is clear: Dr. Bard was not dissatisfied with Plaintiff's performance. Rather, Dr. Bard sought to remove Plaintiff from his position after learning of the discrimination complaint.

**The Termination Letter and Pretextual Stated Reasons**

47. On November 8, 2023, Plaintiff received a termination letter dated November 8, 2023, informing him that his position as Public Safety Senior Advisor was being eliminated effective December 8, 2023. The stated reason was "a reduction in force" and "changing business needs," citing organizational reorganization.

48. However, as detailed in paragraphs above, this stated reason is pretextual and unsupported by the facts. The University was not conducting a reduction in force. Rather, it was expanding its Public Safety department, creating new positions, and actively recruiting new personnel.

49. The decision to eliminate Plaintiff's position while simultaneously hiring, creating, and maintaining vacant comparable or lower-level positions demonstrates that the true motivation

was not organizational efficiency or budgetary constraint, but rather Dr. Bard's desire to retaliate against Plaintiff for filing the discrimination complaint.

**Involvement of Individuals in Retaliation**

50. Dr. Bard was the primary architect of Plaintiff's termination. Dr. Bard:

a) Made age-related comments to Plaintiff;

b) Decided to eliminate Plaintiff's position in early 2023, contingent on Dr. Bard's willingness to proceed with the elimination;

c) Learned of Plaintiff's discrimination complaint in early August 2023;

d) Immediately changed his treatment of Plaintiff, canceling meetings and excluding him from decisions;

e) Proceeded with the termination decision, communicating it to Plaintiff on November 8, 2023.

51. Shanon Shumpert:

a) Conducted a biased and inadequate investigation into Plaintiff's discrimination complaint;

b) Revealed her personal friendship with Dr. Bard at the outset of the investigation, creating an appearance of bias;

c) Failed to interview witnesses to the alleged discrimination;

d) Made conclusory findings that the allegations did not violate University policy despite finding Plaintiff's account credible;

e) Closed the investigation without taking corrective action;

f) Effectively ratified Dr. Bard's conduct by her failure to recommend any meaningful remedy or discipline.

52. Paul Pineau:

a) Received Plaintiff's discrimination complaint on June 29, 2023;

b) Directed the complaint to the Office of Institutional Equity without ensuring that the investigation would be conducted in a competent, impartial, and thorough manner;

c) Failed to follow up on the investigation or ensure that Plaintiff was protected from retaliation;

d) As General Counsel, bore responsibility for ensuring compliance with federal employment laws and failed to do so.

53. Sometime in August 2023, after the August 4th meeting, Paul Pineau organized a meeting of the Public Safety leadership team, that included the Plaintiff and Dr. Bard, alleging that he wanted to meet the leadership team. However, during the meeting Paul Pineau repeatedly stated that he recommended Dr. Bard to be hired, and repeatedly expressed his support for Dr. Bard.

54. Ronald J. Daniel and The Johns Hopkins University, as President of the University and the University itself:

a) Both bore responsibility for ensuring that the University's employment practices complied with federal and state law;

b) Both failed to establish and enforce adequate safeguards against discrimination and retaliation;

c) Both failed to investigate or remedy Plaintiff's discrimination complaint in good faith;

d) Both permitted a culture in which supervisors could engage in age and other protected-category discrimination with impunity.

**COUNT I: AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. § 623(a)**

55. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint.

56. This Count is brought pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), which provides that it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."

57. Plaintiff establishes a prima facie case of age discrimination under the ADEA as follows:

a) Protected Class: Plaintiff is a member of the protected class of individuals age 40 and older, having been 61 years old at the time of his termination. 29 U.S.C. § 631(a);

b) Satisfactory Job Performance: Plaintiff performed his job responsibilities satisfactorily and in a manner that met or exceeded legitimate job expectations. As detailed in paragraphs above,

Plaintiff's performance was recognized by Dr. Bard through assignment of additional responsibilities, continued assignment as second in command, participation in key decision-making, quality of work product, and a salary increase in February 2023. There is no contemporaneous documentation of any performance deficiency;

c) Adverse Employment Action: Plaintiff suffered an adverse employment action—specifically, termination of his employment—on December 8, 2023;

d) The circumstances surrounding Plaintiff's termination give rise to a reasonable inference of unlawful age discrimination. Specifically:

     i.    Dr. Bard, the decision-maker responsible for Plaintiff's termination, made age-related comments to Plaintiff, including referring to Plaintiff as the "grandfather" of the group at a lunch with colleagues in January-February 2023. These comments made by a decision-maker regarding Plaintiff's age illustrate discriminatory animus;

    ii.    Plaintiff's termination occurred approximately 4.5 months after Plaintiff filed his discrimination complaint (June 29, 2023) and approximately three months after Dr. Bard learned of the complaint (early August 2023).

    iii.    The temporal proximity between age-based comments and termination is also probative.

    iv.    Dr. Bard's age-related remarks and his termination decision demonstrate a nexus between Plaintiff's age and the adverse employment action;

    v.    Dr. Bard's treatment of Plaintiff changed markedly after learning of the discrimination complaint in August 2023.

    vi.    The pattern of isolation and diminishment preceded the formal termination decision, supporting an inference that age-based animus influenced the termination decision;

    vii.    The stated reason for termination—reduction in force and changing business needs—is pretextual, as the University was simultaneously expanding its Public Safety department, creating new positions, and leaving numerous comparable positions vacant;

    viii.    Terminating Plaintiff's position while maintaining or creating positions at similar or lower levels has a disparate impact on older workers;

    ix.    Dr. Bard's post-hoc allegations of performance deficiency are unsupported by contemporaneous documentation and are contradicted by his own conduct (assignment of

additional duties, continued leadership role, salary increase).

58. Even if the University proffers a legitimate, non-discriminatory reason for Plaintiff's termination (the reduction in force and changing business needs), evidence reveals that this stated reason is pretextual and that Plaintiff's age was a motivating factor in the termination decision:

a) The stated reason—reduction in force—is contradicted by the fact that the University was simultaneously hiring and creating positions;

b) The stated reason is inconsistent with Dr. Bard's conduct in February 2023 (giving a raise and assuring Plaintiff his position was secure) and Spring 2023 (assigning additional responsibilities);

c) The temporal proximity between the discrimination complaint and termination, combined with the immediate change in Dr. Bard's treatment of Plaintiff upon learning of the discrimination complaint, demonstrates that the termination was motivated by retaliation for the protected activity rather than by legitimate business reasons;

d) Plaintiff's age was a but-for cause of the termination. But for Plaintiff's age and the age-related comments made by Dr. Bard, Plaintiff would not have been terminated.

57. As a direct and proximate result of Defendants' unlawful age discrimination, Plaintiff has suffered:

    a) Loss of wages, benefits, and employment from December 8, 2023, to the present and continuing into the future;
    b) Diminished earning capacity and impaired career advancement;
    c) Loss of health insurance and retirement benefits;
    d) Emotional distress, humiliation, and injury to reputation;
    e) Attorney's fees and costs.

**WHEREFORE**, Plaintiff demands judgment against Defendant, back pay and front pay, including all lost wages, salary, bonuses, and benefits from December 8, 2023, to the date of judgment and into the future, in an amount to be proven at trial but estimated to exceed $500,000; for compensatory damages for emotional distress, humiliation, injury to reputation, loss of enjoyment of life, and other non-pecuniary harms in an amount exceeding $300,000; liquidated damages, in an amount equal to

the pecuniary loss, as permitted by 29 U.S.C. § 626(b) for willful violations of the ADEA; reasonable attorney's fees and costs under 29 U.S.C. § 626(b), pre-judgment and post-judgment interest at the maximum rate permitted by law; and, such other relief as this Court deems just and proper.

## COUNT II: RETALIATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. § 623(d)

58. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint.

59. This Count is brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623(d), which provides:

"It shall be unlawful for any employer to discriminate against any of his employees ... because such individual has opposed any practice made unlawful by [the ADEA], or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]."

60. Plaintiff engaged in protected activity by filing a written discrimination complaint against Dr. Bard with the University's General Counsel on June 29, 2023, alleging unlawful discrimination and harassment based on protected classes (age, race, and gender) and creating a hostile work environment. This complaint was made to the University's Senior Vice President and General Counsel, the appropriate institutional recipient for employment discrimination complaints. Filing a discrimination complaint is per se protected activity under 29 U.S.C. § 623(d);

61. Plaintiff suffered a materially adverse employment action—specifically, termination of his employment—effective December 8, 2023. Termination of employment is the paradigmatic adverse action;

62. There is a causal connection between Plaintiff's protected activity (filing the discrimination complaint) and the adverse employment action (termination). Specifically:

   a. Plaintiff filed the discrimination complaint on June 29, 2023, and Dr. Bard learned of the complaint in early August 2023. Plaintiff's termination was communicated on November 8, 2023, approximately 4.5 months after the complaint and approximately 3 months after Dr. Bard's awareness of it. Courts recognize that

temporal proximity of this magnitude—particularly when combined with other evidence—can establish the causal connection required for a retaliation claim.;

b. Immediately following Dr. Bard's awareness of the discrimination complaint in August 2023, Dr. Bard's conduct toward Plaintiff changed markedly. Dr. Bard began canceling previously scheduled one-on-one meetings, ceased regular daily communication, excluded Plaintiff from key decision-making, and effectively isolated Plaintiff from the leadership team. This change in conduct is probative of a causal connection between the complaint and the adverse action;

c. While Dr. Bard claims to have decided in early 2023 to eliminate Plaintiff's position, the timing of the formal termination communication (November 8, 2023) closely follows Dr. Bard's learning of the discrimination complaint and the change in his treatment of Plaintiff. This compressed timeline supports an inference of retaliatory motivation;

d. The University's normal procedure for significant organizational changes would presumably include advance notice to the affected employee, transition planning, and consideration of alternative positions. Plaintiff received abrupt notice of termination with minimal explanation or consideration of alternatives;

e. Beyond temporal proximity and change in conduct, the evidence discussed in Count I above (pretextual stated reason, expansion rather than reduction in force, availability of alternative positions, post-hoc fabrication of performance concerns) supports an inference that retaliation, rather than legitimate business reasons, motivated the termination.

63. Consistent with the ADEA retaliation standard, Plaintiff asserts that retaliation was a but-for cause of the adverse employment action.

64. Defendants proffer that the termination was due to a reduction in force and changing business needs, not retaliation is pretextual because:

i.  a) The evidence detailed in the above paragraphs demonstrate that the University was expanding its Public Safety department, not conducting a reduction in force;

ii. b) The University could have and should have reassigned Plaintiff to one of numerous vacant positions;

iii. c) The temporal proximity between the discrimination complaint and the termination, combined with the immediate change in Dr. Bard's conduct toward Plaintiff, demonstrate that the termination was retaliatory;

iv. d) Retaliation was the but-for cause of the termination.

65. The causal connection between Plaintiff's protected activity and the adverse employment action include:

a) The strong temporal proximity (approximately 3 months from Dr. Bard's awareness of the complaint to termination);

b) The immediate and marked change in Dr. Bard's conduct toward Plaintiff upon learning of the complaint;

c) The pretextual nature of the stated reason for termination;

d) The availability of alternative positions demonstrating that termination was not economically necessary;

e) The termination occurred shortly after the complaint and after Dr. Bard's apparent animus toward Plaintiff for filing the complaint became evident through his conduct.

66. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered.

67. Plaintiff has suffered the following non-exhaustive list of injuries:

a) Loss of wages, benefits, and employment from December 8, 2023, forward;

b) Impaired career advancement and diminished earning capacity;

c) Loss of health insurance and retirement contributions;

d) Emotional distress, humiliation, and injury to reputation in the workplace;

e) Attorney's fees and costs.

**WHEREFORE**, Plaintiff demands judgment against Defendant, for Back pay and front pay, including all lost wages, salary, bonuses, and benefits from December 8, 2023, to the date of judgment and into the future, in an amount to be proven at trial but estimated to exceed $500,000; Compensatory damages for emotional distress, humiliation, injury to professional reputation, and other non-pecuniary harms in an amount exceeding $300,000; Liquidated damages, in an amount equal to the pecuniary loss, as permitted by 29 U.S.C. § 626(b) for willful violations of the ADEA; Reasonable attorney's fees and costs, including expert witness fees, as permitted by 29 U.S.C. § 626(b); Pre-judgment and post-judgment interest at the maximum rate permitted by law; and, such other and further relief as this Court deems just and proper, including but not limited to reinstatement, front pay in lieu of reinstatement, and punitive damages if permitted by law.

**COUNT III: DISCRIMINATION BASED ON RACE AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e ET SEQ.**

68. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint.

69. This Count is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which prohibits discrimination based on race, color, religion, sex, or national origin.

70. Plaintiff is himself a member of a racial or ethnic minority, and also witnessed and was affected by Dr. Bard's pervasive pattern of racial discrimination and harassment directed at other employees.

71. Furthermore, Plaintiff's complaint regarding this conduct and the retaliation against him for complaining constitute violations of Title VII.

72. Dr. Bard made repeated, inappropriate, and offensive comments regarding the personal relationships and family members of African-American employees, including:

a) A comment that an African-American employee (referred to as "WS") was likely married to a White woman, made in a manner that was demeaning and presumptive;

b) A comment that another African-American employee (referred to as "JJ") had a White baby, made in a manner that was derogatory and demeaning, implying disapproval or mockery.

73. These comments, made by Plaintiff's supervisor in the workplace, created a hostile work environment not only for the African-American employees targeted but also for Plaintiff, who witnessed the discriminatory conduct and was affected by the overall hostile atmosphere.

74. Plaintiff filed a discrimination complaint that specifically included allegations of racial harassment by Dr. Bard. For this reason, Plaintiff is protected under Title VII from retaliation. Even if Plaintiff had not himself experienced age discrimination, his complaint regarding racial discrimination would be protected activity, and any adverse employment action taken in retaliation for this protected activity would violate Title VII.

75. Plaintiff's termination occurred in direct temporal proximity to his filing of the discrimination complaint that included allegations of racial discrimination. This temporal proximity, combined with the evidence of Dr. Bard's pretextual stated reason and the availability of alternative positions, demonstrates that retaliation was the but-for cause of Plaintiff's termination.

76. Plaintiff filed a discrimination complaint alleging racial discrimination and harassment by his supervisor, Dr. Bard, in violation of Title VII

77. Plaintiff's employment was terminated;

78. The temporal proximity and change in conduct by Dr. Bard after learning of the complaint demonstrate causation.

79. Plaintiff has suffered compensatory damages including loss of wages, benefits, emotional distress, and attorney's fees.

80. JHU's conduct described in this Count was undertaken with malice or reckless indifference to Plaintiff's federally protected rights. The University, acting through its senior officials with authority over Plaintiff's employment, knew or should have known that tolerating and ratifying racially hostile conduct, and retaliating against Plaintiff for opposing that

conduct, violated Title VII, yet failed to take adequate remedial action and instead allowed the discrimination and retaliation to continue. Accordingly, Plaintiff seeks punitive damages against JHU to the extent permitted by 42 U.S.C. § 1981a(b), subject to the statutory caps applicable to employers of JHU's size

**WHEREFORE**, Plaintiff demands judgment against Defendant for Back pay and front pay, including all lost wages, salary, bonuses, and benefits from December 8, 2023, to the date of judgment and into the future, in an amount to be proven at trial but estimated to exceed $500,000; compensatory damages for emotional distress, humiliation, injury to reputation, loss of enjoyment of life, and other non-pecuniary harms in an amount exceeding $300,000 (subject to the combined statutory cap set forth in 42 U.S.C. § 1981a(b)(3)(B) for employers with more than 500 employees); punitive damages in an amount exceeding $300,000 (subject to the combined statutory cap with compensatory damages set forth in 42 U.S.C. § 1981a(b)(3)(B)); reasonable attorney's fees and costs, including expert witness fees and costs of litigation, as permitted by 42 U.S.C. § 2000e-5(k); pre-judgment and post-judgment interest at the maximum rate permitted by law; and, such other and further relief as this Court deems just and proper, including but not limited to reinstatement, front pay in lieu of reinstatement, and any additional relief this Court finds appropriate.

### COUNT IV: RETALIATION FOR OPPOSING DISCRIMINATORY PRACTICES IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-3(a)

81. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint.

82. This Count is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), which states:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because the employee has opposed any practice made an unlawful employment practice by this subchapter."

83. On June 29, 2023, Plaintiff filed a written complaint with the University's General Counsel opposing discriminatory practices by Dr. Bard, specifically alleging:

a) Unlawful racial discrimination

b) Age discrimination (Plaintiff's opposition to age-discriminatory practices is protected activity under Title VII's retaliation provision to the extent it relates to opposition of unlawful employment practices generally);
c) Harassment creating a hostile work environment;
d) Harassment based on protected characteristics.

84. By filing his complaint, Plaintiff opposed practices that he reasonably believed to be unlawful under Title VII and other federal employment laws.

85. Plaintiff was terminated from his employment on December 8, 2023, constituting an adverse employment action under Title VII.

86. The temporal proximity between Plaintiff's protected complaint (June 29, 2023; Dr. Bard's awareness in August 2023) and the termination (November 2023), combined with the immediate change in Dr. Bard's conduct toward Plaintiff and the pretextual stated reason for termination, establishes the requisite causal connection.

87. The stated reason for termination—reduction in force and changing business needs—is pretext, as the University was simultaneously expanding its Public Safety department, creating new positions, and leaving numerous positions vacant.

88. While Defendants may proffer a non-retaliatory reason, this reason is pretext and that retaliation was a contributing factor in the adverse employment action.

89. Plaintiff has suffered loss of wages, benefits, emotional distress, and is entitled to attorney's fees.

90. JHU's retaliation against Plaintiff for opposing discriminatory practices, as alleged in this Count, was carried out with malice or reckless indifference to Plaintiff's federally protected rights. Senior decisionmakers at the University were aware that terminating Plaintiff for filing a discrimination complaint violated Title VII, yet nonetheless proceeded with the adverse action after learning of his complaint and in the face of clear evidence of his protected activity. Accordingly, Plaintiff seeks punitive damages against JHU under 42 U.S.C. § 1981a(b), subject to the statutory caps applicable to employers of JHU's size

**WHEREFORE**, Plaintiff demands judgment against Defendant for Back pay and front pay, including all lost wages, salary, bonuses, and benefits from December 8, 2023, to the date of judgment and into the future, in an amount to be proven at trial but estimated to exceed $500,000; compensatory damages for emotional distress, humiliation, injury to professional reputation, loss of enjoyment of life, and other non-pecuniary harms in an amount exceeding $300,000 (subject to the combined statutory cap set forth in 42 U.S.C. § 1981a(b)(3)(B) for employers with more than 500 employees); punitive damages in an amount exceeding $300,000 (subject to the combined statutory cap with compensatory damages set forth in 42 U.S.C. § 1981a(b)(3)(B)); reasonable attorney's fees and costs, including expert witness fees, as permitted by 42 U.S.C. § 2000e-5(k); pre-judgment and post-judgment interest at the maximum rate permitted by law; and, such other and further relief as this Court deems just and proper, including but not limited to reinstatement or front pay in lieu thereof, injunctive relief, and such other relief as equity and justice require.

Respectfully Submitted this 11th day of December, 2025.


_____
LATOYA FRANCIS-WILLIAMS, ID No. 29957
Law Office of Latoya A. Francis-Williams, LLC
P.O. Box 451
Randallstown, Maryland 21133
Telephone: (410) 356-4691
Facsimile: (443) 548-4588
Email: lfwlaw1@gmail.com
*Attorney for Plaintiff Rodney Hill*

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **RODNEY HILL** | ) | |
| Baltimore, Maryland | ) | |
| *Plaintiff,* | ) | |
| **vs.** | ) | Case No.:  1:25-cv-4067 |
| **THE JOHNS HOPKINS UNIVERSITY** | ) | |
| 3400 N. Charles Street | ) | |
| Baltimore, Maryland 21218 | ) | |
| **SERVE ON**: TIFFANY WRIGHT, SVP & | ) | |
| GENERAL COUNSEL | ) | |
| 3400 N. CHARLES STREET | ) | |
| 113 GARLAND HALL | ) | |
| BALTIMORE MD 21218 | ) | |

*Defendant.*

---

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

LATOYA FRANCIS-WILLIAMS, ID No. 29957
Law Office of Latoya A. Francis-Williams, LLC
P.O. Box 451
Randallstown, Maryland 21133
Telephone: (410) 356-4691
Facsimile: (443) 548-4588
Email: lfwlaw1@gmail.com
*Attorney for Plaintiff Rodney Hill*